RECEIPT
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

R.I. SEEKONK HOLDINGS, LLC.

Plaintiff

VS.

C.A. No.

TIMOTHY P. McINERNEY, INDIVIDUALLY
AND IN HIS CAPACITY OF TOWN
ADMINISTRATOR of the TOWN OF
SEEKONK and TOWN OF SEEKONK

Defendants

04-11682 NMG

MAGISTRATE JUDGE

## VERIFIED COMPLAINT

### PARTIES

1. Plaintiff, R.I. Seekonk Holdings, LLC ("Seekonk Holdings"), is a Limited Liability Company organized and existing under the laws of and is a citizen of the State of Rhode Island.

2. Seekonk Holdings is registered as a foreign limited liability company with the Corporations Division of the Commonwealth of Massachusetts, pursuant to the requirements of Chapter 156C §48 of the Massachusetts General Laws ("MGL").

3. Upon information and belief, defendant, Town of Seekonk (hereinafter referred to as either "the Town" or "Seekonk"), is a municipal corporation, located in Bristol County, Massachusetts.

4. Upon information and belief, defendant, Timothy P. McInerney ("McInerney"), is a resident and citizen of Seekonk, Bristol County, Massachusetts.

5. At all relevant times mentioned herein, McInerney has been the Town Administrator of Seekonk.

6. At all relevant times mentioned herein, Seekonk has been and is a public employer and has employed numerous persons, including a Town Administrator.

7. At all times since he assumed the position of Town Administrator, McInerney has been a public employee of the Town, purportedly acting within the scope of his office or employment.

8. At all times since he assumed the position of Town Administrator, McInerney has also been a "policy maker" and/or "decision maker" of and for the Town.

## JURISDICTION

9. This Court has original jurisdiction over this action in accordance with 42 U.S.C. 1983, et seq. Jurisdiction also exists by virtue of 28 U.S.C. 1332, et. seq. in that it is a civil action in which the amount in controversy exceeds the value of $75,000.00 (exclusive of interest and costs) and involves citizens of different states.

## VENUE

10. With respect to this action, venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391, in that the events giving rise to the claims that are the subject of this action occurred in the Eastern District of Massachusetts.

## **FACTUAL BACKGROUND AND CONTROVERSY**

11. At all times relevant hereto, H. Charles Tapalian ("Tapalian") has been one of the shareholders of Seekonk Holdings.

12. In October, 1986, Tapalian purchased two (2) large parcels of land at and in the vicinity of Davis Street, Seekonk, having the intent to eventually develop most of the portions thereof.

13. As Tapalian proceeded with his plans, he became embroiled in various disputes with the Town and several of its officials, ultimately resulting in the filing of an action in the Bristol County, Massachusetts Superior Court. That action was filed in 1990, docketed under civil action file number 90-02184, and came to be known as "Tapalian v. Town of Seekonk, et al" ("Case #1").

14. While Case #1 was pending, the Town's then Building Inspector (acting on the advice of Town Counsel) refused to issue various permits for buildable lots along Davis Street, Seekonk.

15. In June, 1994, Tapalian initiated a second action, naming the Town and such Building Inspector (as Defendants). That case also came to be docketed in the Bristol County (Massachusetts) Superior Court under civil action number 94-00879 ("Case #2").

16. Following a conciliation meeting in the Superior Court concerning Case #1, a so-called "Agreement for Judgment" ("the Agreement") was entered on or about October 11, 1994.

17. On or about May 27, 1997, the Town paid Tapalian for expenses associated with the aforementioned refusal to issue building permits, whereupon Case #2 was dismissed, without prejudice.

18. As a result of numerous additional incidents, Tapalian initiated contempt proceedings in Case #1 against the Town, its Superintendent of Public Works (James Tusino) ("Tusino") and then Town Administrator (William Keegan) ("Keegan") on or about November 24, 1998.

19. Within a short time, the Town initiated a reciprocal action against Tapalian in the Bristol County (Massachusetts) Superior Court (docket #98-01559, entitled "Town of Seekonk v. H. Charles Tapalian") ("Case #3").

20. On or about July 26, 2000, an agreement was reached in Case #3, replacing Tusino's oversight of certain roadwork being done by Tapalian with that of an independent engineer, ultimately resulting in dismissal of that action.

21. Ongoing interference by Tusino resulted in Tapalian initiating an action against him and the Town which was removed by the defendants to the United States District Court and came to be docketed under civil action number 12389-PBS (entitled, "H. Charles Tapalian v. James V. Tusino") ("Case #4").

22. Upon information and belief, McInerney and the Town are aware that at a Pre-trial Mediation Conference concerning Case #4, Tapalian demanded that Keegan and Tusino permanently resign, in which such event he would withdraw and dismiss that action without monetary compensation.

23. Upon information and belief, McInerney and the Town were also aware that Tapalian's Pre-trial Settlement Conference offers concerning the resignations of Mssrs. Keegan and Tusino were rejected, resulting in the matter moving forward to trial.

24. On May 7, 2002, a jury verdict was returned in favor of Tapalian in Case #4, with compensatory and punitive damages against Tusino in an amount exceeding Two Hundred Eight Thousand ($208,000) Dollars being returned.

25. Subsequent to the verdict in Case #4, Tusino asserted on several occasions that his actions were undertaken as a result of instructions that he received from "the Town".

26. Following the aforementioned verdict against Tusino, several (but not all) past Seekonk Selectmen and former Town Administrator Keegan revealed that Tusino was "just doing what we told him to do" with respect to his actions toward Tapalian.

3

27. Since the untoward actions of the Town and several of its officials continued both during and subsequent to the pendency of Case #4, Tapalian initiated a further action against them. That matter has been docketed under civil action number 02-12216 RGS (entitled, "H. Charles Tapalian v. Lawrence Havrylik, et al") ("Case #5").

28. Upon information and belief, Keegan resigned as Seekonk Town Administrator effective May 15, 2002.

29. Upon information and belief, the Town Administrator of Seekonk is appointed by the Board of Selectmen ("the Selectmen").

30. McInerney subsequently assumed the position of Town Administrator.

31. Upon information and belief, the Seekonk Town Administrator is responsible for the day-to-day operations of all of the departments of the Town of Seekonk. These departments include the Police Department, the Fire Department, the Public Works Department and the Building Inspector.

32. Upon information and belief, the Seekonk Town Administrator appoints the heads of the departments described in the preceding paragraph, following which the Selectmen have a fifteen (15) day period in which they may review and overturn or veto a proposed appointment. Should the Selectmen not exercise that authority, the Town Administrator's appointments are deemed confirmed.

33. Pursuant to Article Six, Section 2(A) of the Seekonk Home Rule Charter, the Town Administrator shall supervise, direct and be responsible for the efficient administration of all functions under his control, as may be authorized by the Charter, By-law, other town meeting vote or by vote of the Board of Selectmen.

34. Pursuant to Article Six, Section 2(D) of the Seekonk Home Rule Charter, the Town Administrator is also responsible to see to it that all provisions of the Massachusetts General Laws, the Home Rule Charter, the Town By-laws and other votes of the town meeting and votes of the Selectmen which require enforcement by him, all officers and employees subject to his direction and supervision are faithfully carried out and performed.

35. Pursuant to Article Six, Section 2(H) of the Seekonk Home Rule Charter, the Town Administrator may at any time inquire into the conduct of an office of any Town Officer, employee, department or other agency under his control.

36. Upon information and belief, after becoming Town Administrator, McInerney became familiar with much (if not all) of the previous litigation history involving Tapalian, the Town, and various officials including Keegan and Tusino.

37. In particular, McInerney became familiar with cases #4 and #5 and in May, 2002 attended a mediation session with Senior Judge Skinner in Boston concerning such matters.

38. Upon information and belief, McInerney and the Town were aware that Tusino had appealed the decision in Case #4 to the United States Court of Appeals for the First Circuit primarily based upon the technical ground that the dismissal of Case #3 should have somehow eradicated any and all responsibility of Tusino toward Tapalian.

39. Although Tapalian was present at such mediation session, McInerney did not interact with Tapalian in any manner at that time. Nevertheless, upon information and belief, McInerney was aware that Tapalian was involved with the development of property and was continuing to have involvement with the development of property in Seekonk.

40. Seekonk Holdings was formed on or about April 17, 2003.

41. By virtue of Tapalian's efforts over several months, on April 22, 2003, Seekonk Holdings entered into a purchase and sales agreement (with several contingencies) for approximately seventy-five (75) acres of land in Seekonk ("the Premises").

42. Over the course of approximately five (5) or six (6) months (i.e., from approximately October or November, 2003 through April, 2004), Tapalian formulated plans and drawings (utilizing the engineering firm of Caputo & Wick) and engaged in discussions and negotiations concerning the project.

43. Tapalian and Seekonk Holdings foresaw several possibilities for the development of the Premises, including a Senior Center to be constructed at Seekonk Holding's sole expense.

44. The initial plans for the Premises called for a mixed project luxury development comprised of upscale, multi-family condominiums and rental units set in a gated community that would provide most services to its residents.

45. Seekonk Holdings learned that the Seekonk Zoning By-Laws had no provisions for multi-family dwellings of the type described above.

46. Pursuant to Section 17 (entitled, "Amendment") of the Town of Seekonk Zoning By-Laws, a change in the zoning by-laws of Seekonk necessary to address a mixed project luxury development of the type described above (a use variance) requires certain public hearing(s) and other procedures described therein.

47. Plaintiff also learned that during his term as Town Administrator, McInerney had established an "open-door" policy wherein he encouraged contractors, developers and others to contact him directly to discuss proposals, plans and concerns relative to projects and other matters in and affecting the Town.

48. An "open door" policy is not unusual and, indeed, is something that promotes mutual cooperation and understanding.

49. An example of McInerney's "open door" policy during the period(s) was his consultation with and support of individuals with Stone Gate Builders concerning a forty-six (46) unit condominium development at Brook Street and Newman Avenue, Seekonk.

50. Upon information and belief, McInerney openly and repeatedly met with Stone Gate Builders and/or their representatives, promoting their proposed development on numerous occasions.

51. Having had no negative experiences with McInerney, plaintiff (acting through Tapalian) initiated several efforts to contact McInerney to discuss the aforementioned project alternatives, the need for an amendment to the Zoning By-Laws and related matters that could be of mutual benefit to both Seekonk Holdings and the Town.

52. Tapalian accordingly placed numerous telephone calls to McInerney during April and May, 2003, leaving messages requesting that a meeting take place to discuss the development of the Premises.

53. The messages that Tapalian left for McInerney made it clear that the purpose of the meeting would be to discuss the Premises, not the past or any past or ongoing litigation.

54. Despite such repeated attempts, McInerney failed and refused to return any of Tapalian's telephone calls or respond to Tapalian's messages in any other manner.

55. During April or May, 2003, Tapalian also met with Selectpersons Christopher Pelletier and Doreen Taylor, at which time he discussed Seekonk Holdings' proposals (approximately 200 luxury condominium units and 144 "high end" rental units), the construction of a Senior Center entirely at Seekonk Holdings' costs and expense, and the overall positive impact that such proposals and projects would have for the Town of Seekonk, its taxpayers and citizens.

56. Selectpersons Pelletier and Taylor expressed positive interest in the plans described in the preceding paragraph and advised Tapalian that they would be interested in watching the plans progress.

57. On or about June 2, 2003, Tapalian became frustrated with McInerney's continued refusal to respond and sent McInerney a letter (by hand delivery) in which Tapalian outlined his efforts (on behalf of Seekonk Holdings) to work with McInerney and disappointment that McInerney had refused to do anything in response to those overtures. A copy of such letter is attached hereto and incorporated herein, by reference, as Exhibit "A".

58. On Friday, June 4, 2003, Tapalian received a letter from McInerney, a copy of which is attached hereto and incorporated herein, by reference, as Exhibit "B" ("the McInerney reply").

59. The McInerney reply was dated June 2, 2003 and arrived in an envelope postmarked June 3, 2003. It did not refer to Tapalian's letter of June 2, 2003, but solely made reference to a previous telephone call from Tapalian.

60. The McInerney reply constituted a complete refusal on McInerney's part to speak and/or meet with Tapalian:

> "Please be advised that any questions, concerns, or items that you wish to meet with me on, should be sent to me in writing. I do not feel that it is in either of our interests to meet on <u>any</u> issues. Kindly send me a letter that clearly states your requests and I will respond accordingly...."
> (Exhibit "B", emphasis added)

61. Following receipt of the McInerney reply, plaintiff's attorney wrote to Town Counsel, explaining that the projects under consideration for the Premises were of such large scope with many potential variables that requiring "discussion" to be reduced to written form would be virtually impossible, inviting only scripted responses instead of a meaningful, free flowing dialogue.

62. On Thursday morning, June 12, 2003, McInerney sent an electronic mail message ("e-mail") to the attention of all Seekonk Department Heads, a copy of which is attached hereto at Exhibit "C" and is incorporated herein, by reference ("McInerney's e-mail").

63. McInerney's e-mail instructed all Seekonk Department Heads that:

> "If you are contacted by <u>someone</u> the town is in litigation with, please <u>refrain from speaking with them</u>. Be polite and state 'that because you have <u>pending litigation</u> against the town, I <u>can not speak to you</u>.' If this person is persistent, please <u>instruct them to come and see me</u>. I have sent out the attached letter that states how I want these discussions handled…"
> (Exhibit "C", emphasis added)

64. The "attached letter" described in the McInerney e-mail was a verbatim copy of the McInerney reply described above (Exhibit "B").

65. The Purchase and Sale agreement by which Seekonk Holdings derived its interest in the Premises required that Seekonk Holdings perform its obligations on a prescribed timeline in which time was "of the essence".

7

66. Upon information and belief, another individual or individuals (such as Francis Vendetti - subsequently elected a Selectman) were involved in litigation with the Town of Seekonk but were not refused the opportunity to discuss matters with department heads and/or to do so only in writing with and by McInerney.

67. The aforementioned actions by McInerney made it crystal clear that he would provide no assistance, either at any Town Meeting or otherwise, thereby totally frustrating Seekonk Holdings' efforts to proceed with its plans of choice for the Premises.

68. Seekonk Holdings was incurring costs and faced with the deadlines required by the Purchase and Sale agreement described above, thus it was required to amend its plans

69. In view of the fact that the Seekonk Zoning By-Laws were silent with respect to such primary plans, plaintiff adopted an alternative plan to develop the Premises as a combination of conventional condominiums and "affordable housing" units under and pursuant to Chapter 40B of the Massachusetts General Laws (commonly, the "Anti-Snob Zoning Act")("40B").

70. Such 40B projects require that a prospective project first be discussed with local officials to allow for community review of such plans before their formal submission.

71. On or about November 3, 2003, Tapalian presented Plaintiff's Revised Plans at an open meeting at the Johnson & Wales, Inn, Seekonk. All of the Selectmen then serving were invited to this presentation.

72. All serving Seekonk Selectmen attended the meeting, except Dana Beale and George Poli.

73. The Selectmen who did attend the presentation voiced satisfaction with the responses that they received and thanked Tapalian and the Plaintiff for having furnished that preliminary opportunity.

74. Plaintiff submitted an application to the Massachusetts Housing Finance Agency ("MassHousing") on or about December 11, 2003.

75. Acting in accordance with his role as Town Administrator, McInerney thereupon became responsible for obtaining and gathering comment and review from various department heads concerning the application that Plaintiff had submitted for its c.40B project to MassHousing.

76. Upon information and belief, McInerney was aware of the history and animosity Tusino had previously exhibited toward Tapalian, of Tapalian's involvement with the plaintiff, and of the fact that the Town of Seekonk had previously replaced Tusino with independent experts while dealing with Tapalian.

77. Upon information and belief, McInerney nevertheless requested and/or directed that Tusino (Seekonk's Public Works Superintendent) review and comment upon plaintiff's proposed c. 40B plans.

78. Upon information and belief, Tusino was also aware of Tapalian's involvement in the plaintiff's proposed project.

79. Upon information and belief, Tusino did not recuse himself, nor did he decline to undertake the review requested by McInerney.

80. Upon information and belief, Tusino (as Public Works Superintendent) provided comments, including (among other things) "concerns" relative to fire protection and storm water drainage on Howland Street, Seekonk (a roadway adjacent to the plaintiff's Premises).

81. Upon information and belief, at the time Tusino furnished the "concerns" described in the preceding paragraph, the Town had a Fire Chief.

82. Upon information and belief, at the time that Tusino furnished the "concerns" described above, Tusino lacked appropriate knowledge and expertise in this area, the Seekonk Fire Chief having been the appropriate official from whom to seek advice and comment concerning fire protection.

83. Upon information and belief, McInerney caused or allowed Tusino's comments (including his fire protection "concerns") to be incorporated among and submitted with the Town's response or comments about plaintiff's c.40B proposal to MassHousing.

84. On or about December 29, 2003, Plaintiff (by Counsel) notified the Town of Seekonk of a claim or claims due to the so-called "Massachusetts Tort Claims Act", based upon McInerney's actions as described above. A copy of that notification (subsequently supplemented) is attached hereto and incorporated herein, by reference, at Exhibit "D".

85. On or about January 28, 2004, Plaintiff (through its representative) held an informational presentation concerning its c.40B plans before the Seekonk Board of Selectmen. McInerney was in attendance and initiated his first contact with Plaintiff by furnishing a c.40B Application form during such open session of the Selectmen.

86. On or about May 4, 2004, MassHousing issued a Project Eligibility (Site Approval) Application response, indicating its approval to the development of no more than one hundred sixty (160) homeownership units under the terms of the c.40B programs, with not less than forty (40) of such units restricted as affordable homeownership units for low- and moderate-income persons or families ("the approval notification").

87. The approval notification incorporated Tusino's "Public Works" "concerns" relative to fire protection, indicating that this and the other "concerns" expressed by "Public Works" (Tusino) were to be addressed by plaintiff in its application for a comprehensive permit to the local Zoning Board of Appeals ("ZBA") and fully explored in the public hearing process.

88. Upon information and belief, McInerney and the Town knew (or in the exercise of reasonable inquiry should have known) that Tusino's "Public Works' comments" were inappropriate, unfounded, and had been interposed solely for the purpose of attempting to delay and/or defeat plaintiff's plans for the Premises.

89. Upon information and belief, the Selectmen requested that McInerney re-invite the Plaintiff to a further Selectmen's meeting June, 2004, to discuss Plaintiff's plans once again.

90. Mr. Tapalian appeared at an open session at the Seekonk Board of Selectmen on June 9, 2004, responding to questions and outlining additional aspects of his proposed plans. McInerney was in attendance (for the first time) and directed questions to Tapalian during such open session.

91. Upon information and belief, McInerney has not modified or rescinded his previous correspondence to Tapalian (exhibit "B").

92. Upon information and belief, McInerney has not modified or rescinded his previous directive (exhibit "C") to Department heads.

93. McInerney and the Town of Seekonk have established and allowed to exist an unwritten, yet real, policy of content-based discrimination, improper and unequal treatment, the suppression of freedom of speech, the deterrence of the right to petition government, and selective enforcement through the pretextural use of codes and/or laws for the purposes of attempting to punish Tapalian and those (including the plaintiff) with which Tapalian is involved or does business.

94. While not always reduced to written form nor officially promulgated in any perceptible manner, the policies described in the preceding paragraph have been and are recognized and allowed to be and continue to be an accepted type of conduct and practice as applied to Tapalian and certain others with whom Tapalian is involved or does business.

95. At all relevant times herein, defendants have acted under the color of State Law and authority.

96. The actions of McInerney and Seekonk toward the plaintiff have been arbitrary, capricious, negligent, malicious, pretextural, and unrelated to any legitimate objective(s) of the Town of Seekonk.

97. Others similarly situated to plaintiff have not been treated by McInerney and/or the Town in the same or similar fashion.

98. As a result of the disparate, inappropriate manner in which McInerney and the Town have responded to plaintiff, Seekonk Holdings has been subjected to considerable, unwarranted delays, increased expense, loss of anticipated profits, lost business opportunities, loss of income, and/or has been otherwise damaged.

99. A panel of the United States Court of Appeals for the First Circuit rendered a decision on July 23, 2004, denying Tusino's appeal of Case #4, and has entered judgment affirming the verdict returned against Tusino in the District Court.

100. The Court of Appeals noted that it could rationally be inferred that Tusino had engaged in a "malicious orchestrated campaign causing substantial harm" to Tapalian, thereby constituting a "gross abuse of power".

101. Upon information and belief, the actions of the defendants comprise and constitute a continued effort to stop and stifle any Seekonk projects in which Tapalian has any involvement since Tapalian is not "on the right team", regardless of the consequences to others such as the plaintiff.

102. All preceding paragraphs of this Verified Complaint are restated and incorporated, by reference, in each and every Count that follows.

## COUNT ONE
(Denial of Equal Protection – United States Constitution – Town of Seekonk)

103. The actions of the Town toward plaintiff, as aforesaid, have caused Seekonk Holdings to be selectively and disparately treated when compared to others similarly situated.

104. The selective treatment afforded plaintiff has been based upon impermissible considerations, such as the intent to inhibit and/or punish the exercise of its Constitutional Rights or to maliciously and/or in bad faith injure plaintiff.

105. Seekonk Holdings is accordingly entitled to compensatory damages, attorney fees and costs against the Town of Seekonk for violation of the Equal Protection clause of Amendment XIV to the Constitution of the United States of America, as applied to the Commonwealth of Massachusetts and its political subdivisions pursuant to 42 U.S.C. 1983, et. seq.

## COUNT TWO
(Denial of Equal Protection - United States Constitution - McInerney)

106. The actions of McInerney toward the Plaintiff, as aforesaid, have caused Seekonk Holdings to be selectively and disparately treated when compared to others similarly situated.

107. The selective treatment afforded Plaintiff has been based upon impermissible considerations, such as the intent to inhibit and/or punish the exercise of its Constitutional Rights or to maliciously and/or in bad faith injure Plaintiff.

108. Seekonk Holdings is accordingly entitled to compensatory damages, punitive damages, attorney fees and costs against McInerney for violation of the Equal Protection clause of Amendment XIV to the Constitution of the United States of America, as applied to the Commonwealth of Massachusetts and its political subdivisions and their agents pursuant to 42 U.S.C. 1983, et. seq.

## COUNT THREE
(Violation of Rights of Free Communication, Peaceable Assembly and Petitioning for Redress of Grievances - United States Constitution - Town of Seekonk)

109. Seekonk Holdings has a clear, legal right, to freely exercise its right of appropriate speech, to peaceably assemble and to petition the Government for a redress of grievances, without official hindrance, without experiencing retaliatory conduct, and without the selective, inappropriate, pretextural and vexatious policies (written and unwritten) adopted and utilized by the Town of Seekonk.

110. The actions of the Town of Seekonk have intentionally and maliciously violated Plaintiff's rights under the First Amendment to the United States Constitution.

111. Seekonk Holdings is accordingly entitled to compensatory damages, attorney fees, costs and such further relief against the Town as my be appropriate in the circumstances for such violation of the First Amendment to the United States Constitution and pursuant to 42 USC 1983, et seq.

## COUNT FOUR
(Violation of Rights of Free Communication, Peaceable Assembly and Petitioning for Redress of Grievances - United States Constitution - McInerney)

112. Seekonk Holdings has a clear, legal right, to freely exercise its right of appropriate speech, to peaceably assemble and to petition the Government for a redress of grievances, without official hindrance, without experiencing retaliatory conduct, and without the selective, inappropriate, pretextural and vexatious policies (written and unwritten) adopted and utilized by McInerney.

113. The actions of McInerney have intentionally and maliciously violated Plaintiff's rights under the First Amendment to the United States Constitution.

114. Seekonk Holdings is accordingly entitled to compensatory damages, punitive damages, attorney fees, costs and such further relief against McInerney as my be appropriate in the circumstances for such violation of the First Amendment to the United States Constitution and pursuant to 42 U.S.C. 1983, et seq.

### COUNT FIVE
(Claims Against Town of Seekonk --- Massachusetts Tort Claims Act)

115. M.G.L. c. 258 (the "Massachusetts Tort Claims Act") provides (in pertinent part) that "no public employee shall be liable for any injury or loss of property... caused by his negligent or wrongful act or omission while acting within the scope of his office or employment", thus McInerney is not named as a party defendant in this action.

116. M.G.L. c. 258 § 2 provides however, that a public employer is liable for such injury as if it were a private individual.

117. Although not required to do so, the Town has never responded to plaintiff's aforementioned notification of the claim pursuant to the Massachusetts Tort Claims Act.

118. The actions of McInerney in the manner and capacity described herein entitled Seekonk Holdings to compensatory damages, attorney fees and costs against the Town of Seekonk pursuant to Massachusetts Tort Claims Act.

### **DEMANDS FOR JUDGMENT**

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages on all counts and for punitive damages against the individual defendant, McInerney, (in his individual capacity) under Counts II and IV, together with attorney fees and costs from all defendants and for such further relief as may be appropriate in the circumstances.

### **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial, by jury, on all issues so triable.

R.I. SEEKONK HOLDINGS, LLC.<br>
By its Attorney,

*[signature]*

John B. Reilly B.B.O. # 545576
John Reilly & Associates
Summit West - Suite 330
300 Centerville Road
Warwick, Rhode Island 02886
401-739-1800
FAX (401) 738-0258

## **VERIFICATION**

The undersigned, being duly sworn upon oath, herby depose and say that:

1. I am the Authorized Member of R.I. Seekonk Holdings, LLC in the within action.

2. On behalf of R.I. Seekonk Holdings, LLC, I herby verify that the facts and matters contained in the forgoing Verified Complaint are, to the best of my personal knowledge and belief, true and accurate and, with respect to those matters which are asserted to be "upon information and belief", I believe them to be as stated.

3. Subscribed and sworn to before me at Providence, in the State of Rhode Island, this 29 day of July, 2004.

*[signature]*

R.I. Seekonk Holdings, LLC.
By David Tapalian
Its Authorized Member

14