# EXHIBIT D

**January 19, 2005**
The Board of Selectmen voted unanimously in Executive Session to release these Executive Session Meeting Minutes to the Public

# MINUTES OF
# BOARD OF SELECTMEN
# EXECUTIVE SESSION
# NOVEMBER 1, 2000

**PRESENT:**

Selectmen:

Chairman:  L. Havrylik,
N. Helgerson, D. Kinniburgh, G. Poli, and A. Varone

Town Administrator:  W. Keegan          Secretary:  C. Dacanay

Fire Chief:  D. Viera          East Providence
Fire Department:  J. Queenan

Superintendent
of Public Works:  J. Tusino          Town Counsel:  M. Lehane

**Mr. Havrylik called the meeting to order at 6:02 p.m.**

At 6:02 p.m., a motion was made by A. Varone to enter into Executive Session To consider the purchase, exchange, taking, lease, or value of real property if such discussion may have a detrimental effect on the negotiation position of the governmental body, to discuss Strategy Relative to Pending Litigation, and Strategy Relative to Collective Bargaining, and then reconvene in Open Session, seconded by A. Varone, and the roll call vote was:

MR. KINNIBURGH – yes;  MR. VARONE – yes;  MR. HAVRYLIK – yes;
MR. POLI – yes;  MR. HELGERSON - yes

A. **TO CONSIDER THE PURCHASE, EXCHANGE, TAKING, LEASE, OR VALUE OF REAL PROPERTY IF SUCH DISCUSSION MAY HAVE A DETRIMENTAL EFFECT ON THE NEGOTIATION POSITION OF THE GOVERNMENTAL BODY**
*(a copy of which is attached and incorporated into this record)*
M. Lehane began by saying that eminent domain allowed a governmental entity ·to take private property for public purposes.  He continued by saying in order to

*Page 2 -- Executive Session Meeting Minutes*
*November 1, 2000*

exercise the power of eminent domain that it first required a two-thirds vote of approval from Town Meeting, that an appropriation be made by Town Meeting in order to fund the exercise of the eminent domain, and that the taking authority has had an appraisal done of the property to ascertain what its fair market value is. He said that the downside to eminent domain taking was that in many cases when land is taken against the wishes of the owner, litigation ensued over the value of that land. He indicated that due to a 3-year statute of limitations, the ultimate extent of the financial disclosure in some cases for 8 to 9 years.

L. Havrylik said that the land in question was in the process of being developed.

N. Helgerson stated that it was better to negotiate a sale instead of taking any land by eminent domain.

D. Viera explained that if at all possible, the Town was not interested in taking any land by eminent domain, but to actually negotiate for it.

## B. STRATEGY RELATIVE TO PENDING LITIGATION

J. Tusino *(a copy of which is attached and incorporated into this record)*
W. Keegan began by saying the purpose of this evening was to discuss strategy, and that J. Tusino was requesting that the Town provide complete counter-defense from H. Charles Tapalian, Robert DelRosso, Sandra Young, Dawn Dessaint, Karen Spearin, Wahlene Siconio, and John Reilly, and perhaps others. He stated that the time had come for the Town to take defensive action.

J. Tusino indicated that there had been a history and that H. Tapalian waited for faces on the Board of Selectmen to change and then he strikes, again. He stated that Attorney Lehane's firm needed to stay on top of this case and that the damage to him personally, was extremely stressful and serious, and cited that he was unable to obtain a mortgage because of this matter.

M. Lehane pointed out that J. Tusino had spent an awful lot of time on this matter. He said that in his personal opinion this particular complaint was one of the most vicious he had ever come across. He went on to say that it appeared that H. Tapalian wanted to do what he wanted wherever he wanted. He indicated that the case should be moved from State Court to Federal Court.

W. Keegan said that the Town's insurance company had given the informal 'green light' on the case.

*Page 3 – Executive Session Meeting Minutes*
*November 1, 2000*

M. Lehane stated that his firm would very much like to handle the litigation and said that the Town would not be obligated to pay the legal fees except for the deductible for the insurance policy.

D. Kinniburgh made a motion to defend and to indemnify J. Tusino relative to this lawsuit, seconded by G. Poli, and the roll call vote was:

MR. KINNIBURGH – yes;  MR. VARONE – yes;  MR. HAVRYLIK – yes;
MR. POLI – yes;  MR. HELGERSON - yes

J. D. Anthony
W. Keegan said that he had spoken with the Building Inspector today and that presently, Town Counsel was advising that he needed actual witness testimony to the facility loading trucks at the site. He indicated that since an injunction existed, the loading of trucks would be in contempt. He went on to recommend that since P. Stringham had witnessed trucks being loaded, that he work with the Police Department relative to this matter.

## C.  STRATEGY RELATIVE TO COLLECTIVE BARGAINING

Call Firefighter's Contract
W. Keegan indicated that he had met with the Call Firefighters and extended the 3% for 1-year offer. He said that they will bring back their offer to the Town, and that they wanted a $50 increase per person in clothing allowance.

At 7:41 p.m., a motion was made by A. Varone to enter into Open Session, seconded by N. Helgerson, and the roll call vote was:

MR. KINNIBURGH – yes;  MR. VARONE – yes;  MR. HAVRYLIK – yes;
MR. POLI – yes;  MR. HELGERSON - yes

Respectfully submitted,

*Donald Kinniburgh*

DONALD KINNIBURGH, CLERK

PERSONAL



October 30, 2000

Board of Selectmen
Town of Seekonk
100 Peck Street
Seekonk, MA 02771

DELIVERED IN HAND

Dear Selectmen:

Once again I have been co-named with the Town in a suit
brought by Mr. Tapalian (a copy of which was delivered in
hand to the Town Administrator).  I expect the Town of
Seekonk to provide for my complete defense and any counter
claims for intentional infliction of emotional distress and
defamation against Mr. H. Charles Tapalian and third party
action against Mr. Robert Delrosso, Ms. Sandra Young, Ms.
Dawn M. Dessaint, Ms. Karen Spearin, Ms. Wahlene Silonio,
Mr. John B. Reilly, and others.

I believe I am so entitled to a complete defense because the
alleged allegation arise out of my direct duties as the
Superintendent of Public Works for the Town.

Sincerely,

James Tusino

CC:   Town Administrator
      Town Counsel

January 19, 2005
The Board of Selectmen voted unanimously
in Executive Session to release these
Executive Session Meeting Minutes to the
Public

## MINUTES OF
## BOARD OF SELECTMEN
## EXECUTIVE SESSION
## AUGUST 28, 2002

**PRESENT:**

Selectmen:

Chairman:  G. Poli,
D. Beal, S. Howitt, & D. Taylor

Secretary:  C. Dacanay

Labor Counsel:  K. Feeley

Town Counsel:  M. Lehane

**ABSENT:**

Selectmen:  N. Helgerson

**Mr. Poli called the Meeting to Order at 6:38 p.m.**

At 6:38 p.m., a motion was made by S. Howitt to enter into Executive Session for the purpose of discussing Strategy Relative to Collective Bargaining, and Strategy Relative to Pending Litigation, and not reconvene in Open Session, seconded by D. Taylor, and the roll call vote was:

MS. TAYLOR – yes;  MR. BEAL – yes;
MR. POLI – yes;  MR. HOWITT – yes

*At this time, P. Parker of the Providence Journal stated that prior to the Board's entry into Executive Session, they were required by Law to announce what the topics would cover. The Town's Counsel, M. Lehane, refuted this to be true.*

### A.  STRATEGY RELATIVE TO COLLECTIVE BARGAINING

Veterans' Agent
D. Beal informed the members of the Board that R. Wall had agreed to fill the new contract at a 3% increase for the remainder of the year, and that he would be submitting a weekly report on that Department's activity. He explained that R. Wall would be attending a mandatory training session for Veterans' Agents in Marlboro, MA on September 16th, 17th, and 18th.

### B.  STRATEGY RELATIVE TO PENDING LITIGATION

J. Tusino Appeal
D. Beal said that rumors were circulating that the insurance company wanted to

*Page 2 – Executive Session Meeting Minutes*
*August 28, 2002*

settle the Tapalian suit.

K. Feeley indicated that he had placed a telephone call to P. Costello relative to the exploration of settlement possibilities, although the insurance company had initially been supportive of the appeals' process. He said that P. Costello had told him that the insurance company had since changed that view, and were now seeking a settlement package, which would be inclusive of compensatory damages and attorney's fee, but not the punitive damages. He went on to say that the insurance company would be asking the Town what amount, if any, it would be willing to contribute to the settlement to partially cover the punitive damages.

D. Taylor asked that if the Town of Seekonk had been dropped from the suit, how could it be responsible for any portion of the punitive damages?

M. Lehane answered that the Town was not responsible. He said that the burden was on the insurance company and J. Tusino to make a case both to the Board of Selectmen, and Town Meeting why it would be in their best interest to contribute to the settlement. He stated, however, that he was not suggesting that the Town was legally obligated to do so, but that it might be prudent.

S. Howitt pointed out that former Boards' of Selectmen, Town Counsel, and other Town officials had been involved in the day-to-day goings on, and that J. Tusino had been following their orders.

M. Lehane stated that none of these individuals had ever told J. Tusino not to accept a particular type of gravel, and that this had been a technical, and operational judgement. He reminded the Board of Selectmen that they did not need to come to a decision this evening, as this session was strictly for informational purposes. He expressed concern that on a human level, this must be unbearable for J. Tusino, but that his responsibility was primarily to the Town, and suggested that perhaps a fund could be established to help J. Tusino with the punitive damages. He went on to say that legally, the Town was under no obligation to do this, and that he was not at all surprised that the insurance company wanted to settle.

S. Howitt said that his concern was that since Tapalian was doing other things in Town, this might ultimately enable him to utilize this case as an upper hand to gain what he wanted, which might make other Town officials reluctant towards

*Page 3 – Executive Session Meeting Minutes*
*August 28, 2002*

enforcement. He stated that by the insurance company's willingness to settle, J. Tusino's name would remain uncleared and would leave him in a negative light. He continued by stating that the Planning Board bore a wide berth around Tapalian.

D. Taylor said that she was very curious as to why the insurance company was suddenly so willing to enact a settlement when they had previously been so supportive of the appeals' process.

D. Beal stated that he was all for continuing the appeal, and that he frankly did not want to extend knowledge to the insurance company that the Town was interested in a settlement.

K. Feeley suggested having the insurance company attend an Executive Session and explain to the Board of Selectmen why it was that they were interested in a settlement.

D. Taylor asked how this matter would affect the Town's insurance rating?

G. Poli responded that the Town had only thus far, incurred legal expenses for Town and Labor Counsels.

D. Taylor pointed out that the Town had also paid for the investigator.

D. Beal explained that the purpose of this evening's discussion was to gain a prospective on what the Town could and could not do.

S. Howitt asked how a settlement would affect J. Tusino's employment with the Town?

K. Feeley indicated that if the matter was settled, the Board of Selectmen still had the appropriate facts to determine J. Tusino's continuation of employment with the Town.

G. Poli stated that department heads needed to know that they had the support to do their jobs, and not allow individuals like Tapalian to go to any lengths to gain whatever it was that they wanted.

M. Lehane reminded the Board that this case was not yet over, and that no one knew what the outcome of the appeal would be. He said that hopefully, J. Tusino would be exonerated.

*Page 4 – Executive Session Meeting Minutes*
*August 28, 2002*

S. Howitt indicated that it was important for the public to understand that this was a civil suit, and not a criminal one.

At 7:39 p.m., D. Taylor made a motion adjourn the Meeting, seconded by D. Beal, the roll call vote was:

MS. TAYLOR – yes;  MR. BEAL – yes;
MR. POLI – yes;  MR. HOWITT – yes

Respectfully submitted,

*[signature]*

DANA G. BEAL, CLERK

<u>January 19, 2005</u>
The Board of Selectmen voted unanimously in Executive Session to release these Executive Session Meeting Minutes to the Public

## MINUTES OF
## BOARD OF SELECTMEN
## EXECUTIVE SESSION
## SEPTEMBER 25, 2002

**PRESENT:**

    <u>Selectmen</u>:

        Chairman:  G. Poli,
        D. Beal, S. Howitt, & D. Taylor

<u>Town Administrator</u>:  T. McInerney       <u>Secretary</u>:  C. Dacanay

    <u>Town Counsel</u>:  M. Lehane     <u>MIIA Representative</u>:  M. Cusack

    Superintendent
    <u>of Public Works'</u>:  J. Tusino       Attorney for
                        <u>J. Tusino</u>:  P. Costello

**ABSENT:**

    <u>Selectmen</u>:  N. Helgerson

**Mr. Poli called the Meeting to Order at 6:11 p.m.**

At 6:11 p.m., a motion was made by D. Beal to enter into Executive Session for the purpose discussing Strategy Relative to Collective Bargaining, and Strategy Relative to Pending Litigation, and then reconvene in Open Session, seconded by S. Howitt, and the roll call vote was:

        MS. TAYLOR – yes;  MR. BEAL – yes;
        MR. POLI – yes;  MR. HOWITT – yes

## 1. STRATEGY RELATIVE TO COLLECTIVE BARGAINING

<u>Steelworker's Clerical Grievance</u>
T. McInerney indicated that his response to the Union's Grievance was contained in the Board's packets. He said that he had met with the Union today, and subsequently denied the Grievance, as had been discussed by the Board previously. He stated that if they could not fulfill the requirements of the Finance Committee's secretarial position, then the Board of Selectmen had the right to provide an individual to do the job.

G. Poli cited that the reason the Board of Selectmen had originally put the 3 positions together was to be in compliance with the Special Employee Status provision under Massachusetts General Laws.

T. McInerney explained that he was now waiting to see what the Union's response would be. He pointed out that it was problematic that the Contract did not contain language that the Finance Committee's secretarial position was in fact, in the Union.

Fire Department Grievance
T. McInerney said that he had met with Union, and expected to issue a decision tomorrow. He stated that it was his intent to uphold the Fire Chief's decision by denying the Grievance.

D. Beal indicated that this was strictly a staffing issue.

## 2. STRATEGY RELATIVE TO PENDING LITIGATION

Police/Fire Facility - DaSilva
T. McInerney informed the Board that an appeal had been filed.

M. Lehane explained that at this point, only a Notice of Appeal had been filed, and that it was now the obligation of the Clerk of the Superior Court to assemble the record and submit it to the Appeals' Court. He said that this would be relatively simple as the record consisted of the Complaint, the Town's Motion to Dismiss, and then a couple of Memorandum of Law on both sides. He went on to say that once the entire record was assembled, it would be incumbent upon the plaintiff to enter the case in the Appeals' Court. He expressed frustration over what would be a lengthy appeals' process, as he frankly knew of no way to short-circuit that, but intended to enlist the advice of individuals in his office who have experience in appellate work. He stated that it was his opinion that both the Complaint and Appeal were without merit.

*At 6:18 p.m., P. Costello and J. Tusino entered the Meeting.*

D. Beal asked where this would place the Building Committee in their efforts to solicit bids on the project?

M. Lehane said that this did create a problem for that aspect, as going out to bid

was the step immediately prior to obtaining a building permit. He pointed out that bidders typically were asked to hold their bids open for 30 days, but in this case the bidders would not know if they were to start work this year, or next.

D. Beal agreed that this certainly made things more difficult. He said that the Committee was 95% drawings at this stage, and wanted to go out to bid in a matter of a few weeks in order to be prepared for the November 18th Special Town Meeting request for additional funding. He appealed to the Board of Selectmen to do everything that they could in order to enable the Committee to go forward with their plans.

T. McInerney asked if an injunction would be filed if the Town went ahead with the project?

M. Lehane advised that it would be a high-risk strategy should the Town go forward, because while an appeal was pending, it would give the appearance that the Town was ignoring the law. He said that this would place the plaintiff in a position of being the wronged party in this case. He went on to say that he would be most reluctant to advise the Town to proceed in that manner.

S. Howitt expressed that it was his opinion that the litigant was being used as a figurehead by whatever group did not want the facility built at the Pleasant Street location. He said that he thought that the special interest group was pushing Mrs. DaSilva, and that the attorney was after all, working for free. He asked that if for the sake of alternative strategy if the Town could take Mrs. DaSilva's property by eminent domain?

M. Lehane answered that in theory, the property could be taken. He indicated that a specific action would be required by Town Meeting to do so, as well as, an appropriation based upon an appraisal of fair market value. He said that this would certainly put an end to Mrs. DaSilva's claim, as she would not longer have a stand to pursue.

S. Howitt stated that from Town Meeting standpoint, many individuals were extremely frustrated as this case had been going on for too many years, and that for every year that passed, project costs continued to escalate. He said that personally, he did not necessarily see a problem of approving additional monies, but that taking property from an elderly woman would be. He suggested that the thought of this type of strategy might just be enough to back these people away.

M. Lehane pointed out that in most towns, land taking from an elderly woman would not be palatable.

S. Howitt indicated that what bothered him was that Mrs. DaSilva was being used by the special interest group.

M. Lehane said that he suspected that S. Howitt was right. He went on to say that the downside of eminent domain taking was that the party of the property being taken had 3 years from the taking to initiate a claim that the compensation rendered had been inadequate.

T. McInerney asked how much time was expected to pass during the appeals process?

M. Lehane responded by saying that if the appeal were to play out in the normal course of business, the plaintiff's brief would be due in the Appeals' Court some time around early December 2002. He said that the Town's brief would be due 40 days after, which would put the matter towards the end of January 2003, and the case in all likelihood, would not be scheduled for oral argument until June 2003, or thereabouts. He indicated that a decision would not even be rendered until much later, since the Appeals' Court was running a year behind schedule.

T. McInerney said that this could mean June 2005.

M. Lehane agreed by saying that in the meantime, ways needed to be discovered to move the case along.

D. Beal indicated that since the Town had not heard anything, the Building Committee was under the impression that everything was progressing in a positive direction.

M. Lehane informed the Board that he had spoken with the attorney for the other party briefly after his Motion to Dismiss. He said that he had reminded that attorney that lawyers could be sanctioned for pursuing frivolous claims. He continued by saying that unfortunately, under State Law this could not be pursued until the case had concluded. Under Federal Law, it was up to the judge's discretion that at any point during the proceedings, sanctions could be imposed.

T. McInerney asked if there was any way to take the case to a Federal level?

M. Lehane answered that it could not be, since this was strictly a State matter.

*Page 5 -- Executive Session Meeting Minutes*
*September 25, 2002*

J. Tusino vs. Tapalian Matter

T. McInerney began by explaining that he felt that it was beneficial for all the parties present to receive an update on the matter.

P. Costello said that the case had been tried in April and May. The Town of Seekonk had been dismissed by Summary Judgement, but the judge had ruled that the claims against J. Tusino would go forward. He said that the verdict was rendered contrary to J. Tusino, and the jury had awarded compensatory damages on Tapalian's equal protection violation claim in the amount of $58,843, punitive damages in the amount of $150,000, attorney's fees were awarded in the sum of $5,000, and attorney's costs were awarded in the amount of $9,800. He explained that when there was a determination of a violation of constitutional rights, the prevailing party was entitled to recover attorney's fees and costs as part of the judgement. He went on to say that he had appealed fully by filing post-trial motions to have the Court throw out the verdict and file a judgement in J. Tusino's favor, which was denied. He said that an appeal was then filed in the First Circuit Court of Appeals', and the matter was now pending. He indicated that he was waiting for the trial transcripts from the court stenographer, which were expected to be ready around the second week of October. He said that the transcripts would have to be paid for, following by a significant amount of time spent reviewing the documents, extracting out all portions in favor of the case, and then prepare the brief. He explained that the briefs would be due in mid-to-late December, or early in January, and that H. Tapalian's brief would be due 30 days later, after which, a hearing would be scheduled. He explained that the First Circuit Court of Appeals' required that a settlement counsel review each case that was filed. Settlement counsel's role was to schedule a meeting with the parties prior to argument of the case in Court to determine if a settlement could be reached avoiding the full process of appeal. He stated that he felt that some issues relative to a settlement existed, which should be addressed and discussed, and that he believed that there was a limited opportunity for settlement of the case. He pointed out that costs would begin to escalate, and that interest continued to accumulate at the post-judgement rate. As of now, $313,000 existed including all components and interest charges. He went on to say that it could be 3 to 6 months to closure by settlement, and up to a year by appeal. He stated therefore, that he felt it would make sense to consider the possibility of a settlement, and determine what, if any, resources were available for this purpose, in order to make a proposal to the plaintiff's counsel. He reminded the Board of Selectmen, that in November of 2000, they voted in favor to indemnify J. Tusino for any liability he might incur in the case. He said that there were valid grounds for appeal as long as it could be established that ample evidence had been entered at the trial. The jury should have

*Page 6 – Executive Session Meeting Minutes*
*September 25, 2002*

determined that the basis for any actions J. Tusino undertook with respect to H. Tapalian's road project were based on rational consideration and concerns for building the road in the proper manner for maintaining public safety while the road was under construction. He indicated that therefore, J. Tusino's actions were neither malicious, nor willful.

S. Howitt asked what would anyone else do if they were J. Tusino and knowing what they did about the testimony of the case, and their career being in danger?

P. Costello stated that it was his opinion that J. Tusino had acted in the interest of the Town at all times in his capacity as Superintendent of Public Works'. He indicated that it was his belief that J. Tusino would not be adverse to a settlement in order to get this matter behind him.

S. Howitt expressed concern that the general public might view the guilty verdict and J. Tusino's continued employment with the Town as a double standard.

P. Costello said that the fact that the vigorous investigation that the Town had undertaken against the allegations of sexual harassment by J. Tusino had not been permitted in Court.

J. Tusino pointed out that H. Tapalian had sued the former Building Inspector, and the former Town Planner, and that the Town had settled in both cases. He explained that his case was the 5th attempt by H. Tapalian to sue an employee of the Town. He went on to say that H. Tapalian dropped suits once started, and cited the example of him dropping one suit on the eve of a site-walk by a judge trying a case, and the dropping of other suits as time when on. He said that every time a change in Board of Selectmen, or Town Administrator occurred H. Tapalian initiated a suit.

P. Costello indicated that H. Tapalian still had not complied with the requirements for his subdivision imposed by a judgement in 1994, and the road was still not completed according to specifications.

S. Howitt said that it was evident that anytime any board or employee of the Town disagreed with H. Tapalian, he sued, and that it set a bad precedent for the enforcement of the Town's Zoning By-Laws.

P. Costello explained that unfortunately, it was not uncommon for many developers to do this on a regular basis.

D. Taylor asked if a reason had been given for the denial of the overturning of the verdict?

P. Costello responded that there had not, and that sometimes a reason was given, and sometimes not. He said that he could not speak for Judge Saris, but that she was under no obligation whatsoever to provide a reason.

G. Poli asked why the Planning Board went ahead and approved roads that were not properly completed?

S. Howitt explained that the Planning Board had relied on the recommendations of the former Town Planner.

J. Tusino stated that changes to the Board of Selectmen, Town Administrator's position, or Town Planner position, were ultimate payoffs for development suits such as this.

P. Costello said that indemnification meant paying the damages that occurred, or playing an active role in the settlement process as it went forward.

J. Tusino indicated that a settlement could mean less of a financial impact than if the appeal was lost.

M. Cusack explained that the insurance company did not pay punitive damages, and must have the Board of Selectmen's approval to even discuss a settlement. He said that he was not confident that a settlement would even be accepted in this case, but that the insurance company's involvement would be in the vicinity of $165,000, and would include attorney's fees and compensatory damages.

G. Poli reminded M. Cusack that he clearly heard him state at a previous Meeting with the Board, that MIIA was in full support of the case, and in it for the long haul.

D. Taylor asked if punitive damages were leveled as a means of punishment?

M. Lehane confirmed that they were.

D. Taylor asked if those could be leveled against a municipality?

M. Lehane indicated that in this case, they would not be because the Town had been dismissed from the lawsuit.

D. Taylor asked if it was being suggested that it was being expected that the Board of Selectmen discuss the possibility of accepting responsibility of the punitive damages?

M. Lehane stated that the Board did vote to indemnify J. Tusino.

D. Taylor asked if the indemnification vote had been taken in Executive Session?

G. Poli confirmed that it had. He said that although he would be amenable to a settlement and have the ability to deal with H. Tapalian in the future, while continuing to support J. Tusino, it would probably not be in the best interest of the Town.

J. Tusino indicated that this would depend on how much the Town would be willing to contribute towards a settlement.

G. Poli asked if the Board was being asked what it would offer towards a settlement?

P. Costello answered not at this time, but that at some point, it would become relevant.

M. Cusack said that the insurance company needed to be empowered by the Board of Selectmen to broach the subject of a settlement including the perameters. He indicated he could then, return to the Board and update them on any progress.

P. Costello stated that it was his opinion that the vote taken to indemnify J. Tusino made it incumbent upon the Town to support him.

D. Taylor pointed out that she was not a member of the Board of Selectmen when the vote was taken. She asked if the dollar amount of the settlement would be capped, or would it be unlimited?

P. Costello answered that it would still be an option for discussion by the Board of Selectmen in the future.

M. Lehane recommended that the last thing the Town wanted would be for H. Tapalian to utilize the Town's position of a settlement as the Town giving in.

T. McInerney asked that if the Board needed to formally vote to enter into this type of negotiation?

*Page 9 – Executive Session Meeting Minutes*
*September 25, 2002*

M. Lehane responded that in his opinion, a vote did not need to be taken at this time.

T. McInerney asked if the sitting Board of Selectmen were required to uphold the indemnification vote of a former Board?

M. Lehane answered that it was unless they voted to change it.

At 7:50 p.m., a motion was made by D. Taylor to enter into Open Session, seconded by S. Howitt, and the roll call vote was:

MS. TAYLOR – yes;  MR. BEAL – yes;
MR. POLI – yes;  MR. HOWITT – yes

Respectfully submitted,

DANA G. BEAL, CLERK

January 19, 2005
The Board of Selectmen voted unanimously in Executive Session to release these Executive Session Meeting Minutes to the Public

## MINUTES OF
## BOARD OF SELECTMEN
## EXECUTIVE SESSION
## JANUARY 15, 2003

**PRESENT:**

Selectmen:

Chairman:  G. Poli,
D. Beal, N. Helgerson, S. Howitt, & D. Taylor

Town Administrator:  T. McInerney          Secretary:  C. Dacanay

Town Counsel:  M. Lehane

At 6:42 p.m., a motion was made by D. Taylor to enter into Executive Session for the purpose of the Approval of Executive Session Minutes, discussion of Strategy Relative to Collective Bargaining, and Strategy Relative to Pending Litigation, and then reconvene in Open Session, seconded by D. Beal, and the roll call vote was:

MS. TAYLOR – yes;  MR. BEAL – yes;  MR. POLI – yes;
MR. HELGERSON – yes;  MR. HOWITT -- yes

## 1.  APPROVAL OF MINUTES

a.  S. Howitt made a motion to approve the Executive Session Meeting Minutes of December 18, 2002 with an addition by D. Taylor, seconded by D. Taylor, and the roll call vote was:

MS. TAYLOR – yes;  MR. BEAL – yes;  MR. POLI – yes;
MR. HELGERSON – yes;  MR. HOWITT – yes

## 2.  STRATEGY RELATIVE TO PENDING LITIGATION

Tapalian vs. Town of Seekonk
M. Lehane began by saying that the situation with H. Tapalian had been going on for an extended period of time, and that going forward, the end certainly was not in sight. He explained that the only way to change these types of situations was by dramatic action. He reminded the Board that P. Costello had had the Board pledge themselves to indemnify J. Tusino, an action which in his opinion, while

*Page 2 – Executive Session Meeting Minutes*
*January 15, 2003*

understanding the Board of Selectmen's intentions, contained multiple risks. He went on to say the Town could not, as a matter of law, indemnify anyone out of available funds the way that it could if it were a judgment against the Town. He said that the Indemnification Statute clearly stated that if the judgment was greater than $10,000, then the Director of the Bureau of Accounts of the Department of Revenue must approve the transaction, but only in the case of judgments against the Town, and not 3rd-parties. He indicated that the Board of Selectmen could not unconditionally pledge to indemnify anyone. He continued by saying that the best that could be done would be that the Board could intend to indemnify, and would make concerted attempts to seek an appropriation for that purpose from Town Meeting. He said that at some point, the Town, and J. Tusino would need to undertake looking at how to satisfy the judgment. He indicated that in a subsequent conversation with P. Costello, he had found out that an issue existed with J. Tusino's father for the conveyance of property, which had been characterized as fraudulent; the trial for which had been set for March 15th. He explained that it was widely believed by H. Tapalian that the property had been sold in an effort to keep it out of the parameters of the judgment award. He cited that the only solution that he foresaw was that if someone took action towards mediation. He recommended a global mediation, and that MIIA must come up with the finances to defend the matter.

G. Poli asked if mediation would at all control subsequent litigation, and what would happen if something occurred in a month?

M. Lehane responded that claims that really did not exist could not be released, but that real or imagined claims could be. He then said that if the matter had been mediated 6 months ago and a settlement reached, a general release would have been executed by H. Tapalian's attorney. The release would have stated that the Town of Seekonk, all their agents, servants, and employees were released from all claims of any nature, kind, or description from the beginning of time up to the present date.

N. Helgerson asked M. Lehane how he would propose getting a spearheaded-operation out of this?

M. Lehane answered that it could be accomplished by: 1.) authorizing P. Costello to approach the other side for the purposes of mediation and to bring L. Kestin into the matter; 2.) go to L. Kestin and indicate that he should approach the attorney for H. Tapalian and propose mediation on all issues including the J. Tusino matter, or; 3.) consider Alternative Dispute Resolution (ADR), which was an organization made up of retired judges, lawyers, and mediators; or go through the State ADR, which would mediate any dispute that was, or might be the subject of litigation.

*Page 3 – Executive Session Meeting Minutes*
*January 15, 2003*

N. Helgerson indicated that it was his preference to go with a completely different identity, and specifically suggested that M. Lehane, or another recommended attorney, as he had reservations over some of the current attorneys. He stated that he was trying to be neutral, but that he wanted the best interest to come back out for the Community.

M. Lehane said that he was suggesting that either P. Costello or L. Kestin initiate the process, but that the Board of Selectmen's members needed to have their own representatives at the table. He explained that by pursuing that course, the promise of the Board of Selectmen would be brought to the table that if a satisfactory agreement was reached, they would go to Town Meeting to seek an appropriation sufficient to fund whatever obligation they had assumed in mediation.

D. Beal stated that the insurance company needed to be on board.

M. Lehane reminded the Board that the insurance company's representative had made it clear that there was no coverage for punitive damages.

S. Howitt brought up the letter that H. Tapalian had sent out, which had said that if J. Tusino testified against the Town, then H. Tapalian would drop the case against J. Tusino.

M. Lehane said that H. Tapalian had not sent out the letter, his attorney had.

D. Taylor reminded the Board that M. Lehane had expressed an interest in handling the case from the beginning, and that for whatever reasons the former Town Administrator had chosen P. Costello. She stated that there was no coordination, and that the process was being blow out of proportion.

G. Poli agreed, but indicated that his biggest concern with indemnification was for the future going forward, not the past. He pointed out that any of the Town's employees would easily give up anything, not to get sued themselves.

M. Lehane said that he was simply suggesting that the Board was not in a position to indemnify J. Tusino, and cited that most likely because of the situation, all the Town's employees were wary when H. Tapalian's name was mentioned. He indicated that it was his belief that J. Tusino had responded as he had been directed to by the former Town Administrator.

D. Beal stated that it was his opinion that H. Tapalian's ultimate goal was to get J. Tusino to testify that there was some type of conspiracy that had taken place by the Office of the Town Administrator and the Board of Selectmen.

*Page 4 – Executive Session Meeting Minutes*
*January 15, 2003*

G. Poli indicated that he found it extremely strange that the 3 current members of the Board who were being sued, were not previously even involved in any issues with H. Tapalian.

D. Taylor stated that it was her opinion that the suit was a strategy by which H. Tapalian had sought to "strangle" a majority of the Board of Selectmen so that they could not discuss or vote on anything relative to the matter.

N. Helgerson pointed out that P. Costello was only involved at the behest of the insurance company.

M. Lehane said that a meeting needed to be set up with P. Costello, L. Kestin, M. Cusack, T. McInerney, and himself to try to get everyone to support the Board's definitive action in resolving the matter.

N. Helgerson made a motion to allow M. Lehane to move forward to spearhead an operation with T. McInerney to combine the suits and put a mediation process together, seconded by S. Howitt, and the roll call vote was:

> MS. TAYLOR – yes;  MR. BEAL – yes;  MR. POLI – yes;
> MR. HELGERSON – yes;  MR. HOWITT – yes

S. Howitt announced that H. Tapalian was now involved in a matter with the City of Providence, Rhode Island relative to property he wanted to develop, and that he was meeting opposition.

D. Taylor asked how the former Town Administrator fit into all of this?

M. Lehane answered that in terms of the mediation process, W. Keegan would not be part of it at all because the insurance company had the right to settle once the lawsuit had been initiated if they were defending it without a reservation of rights, which he believed to be the case. He explained that therefore, the insurance company did not need the permission of the defendants to effect a settlement.

D. Beal asked M. Lehane if he envisioned any conflict that would prohibit any members of the current Board of Selectmen from being sued from taking votes on behalf of the Town?

M. Lehane answered that he did not see that any of the actions taken could be said to be ones in which the Board had a financial interest.

*Page 5 – Executive Session Meeting Minutes*
*January 15, 2003*

N. Helgerson then asked about the release of all of the Executive Session Minutes where any of the litigation had been discussed?

M. Lehane said that it was clear from the Open Meeting Law, that the entire theory behind Executive Session was that there were certain issues that needed to be kept from the public. He continued by saying that Executive Session Minutes were not made to be kept secret, forever. He advised the Board that relative to the issues at hand, release of any of the Executive Session Minutes at this time, would be prejudicial.

Sweet vs. Planning Board
T. McInerney informed the Board that B. Sweet had come to see him and that he had told her that he could not speak with her given her suit against the Planning Board. He said that he wanted to make sure that that course of action was acceptable to the Board. He asked for M. Lehane's opinion?

D. Beal indicated that while he completely understood what B. Sweet was doing, Mr. McInerney's actions were appropriate.

G. Poli agreed.

M. Lehane indicated that Mr. McInerney's response was an entirely appropriate response since the Town was actively involved in litigation and did not want to do anything that would jeopardize its' case.

J. D. Anthony
T. McInerney informed the Board that the hearing had been rescheduled to February 3rd, and that Town Counsel was making every concerted effort to contact the individuals that were purchasing the property to see if they were going to clean up the site, and pay the back taxes.

DaSilva vs. Town of Seekonk
M. Lehane informed the Board that the Appeals' Court had granted the Town's request for a speedy disposition. He said that oral argument was scheduled for February 6th at 9:30 a.m., which did not mean that a decision would be rendered immediately.

Rose vs. Seekonk Police Department
T. McInerney explained that this suit revolved around an alleged false arrest that had occurred in 1997, which had been given to Town Counsel. He said that the insurance company, Great American, had given the case to P. Costello to defend for the Town, but that the statute of limitations had run out.

M. Lehane pointed out that the suit was against the Providence Police Department and not the Town of Seekonk's.

<u>George Amaral</u>
T. McInerney informed the Board that G. Amaral had been cited by the Seekonk Police Department for non-compliance.


3. **STRATEGY RELATIVE TO COLLECTIVE BARGAINING**

<u>Colin Barry</u>
S. Howitt indicated that the Board of Selectmen had basically told C. Barry's attorney that since he had taken the case on a contingency basis and that there was no money left to pay his fees, it was therefore, not the Town's issue.

D. Beal said that the attorney had wanted to reduce the Town's take, but that he was not willing to take any off of his end.

M. Lehane informed the Board that he had sent a letter out to the attorney, which had basically said for him to forward to the Town the money that it was owed.

<u>Police Department's Internet Investigation</u>
T. McInerney informed the Board that the investigation was close to completion. He said that the individuals who had originally indicated that they had witnessed things would not put them in writing, and that they were now saying that they did not see anything.


*At this time,*

- T. McInerney explained that he had done an analysis of the Town's health insurance costs, and that the Water District over the last 17 months had cost the Town $114,000 in claims. He said that they had paid $67,000 in premiums, but that their claims had outpaced that amount. He indicated that a meeting would be held with the Superintendent of the Water District on January 17th. He pointed out that the taxpayers who paid property taxes and paid for water were ultimately paying twice for those, as well as, subsidizing the Water District's enterprise. He stated that this had never been questioned before, and that the liability had never been reviewed. He went on to say that he was going to ask the Water District to pay for what they owed for the last year, and maybe 2 years. He said that if they did not want to cooperate, then he would inform them that they would be on their own, going forward.

Page 7 – Executive Session Meeting Minutes
January 15, 2003

D. Beal made a motion to accept the course of action as proposed by the Town Administrator, seconded by N. Helgerson, and the roll call vote was:

MS. TAYLOR – yes; MR. BEAL – yes; MR. POLI – yes;
MR. HELGERSON – yes; MR. HOWITT – yes

- T. McInerney informed the Board that F. Paquin of the Police Department had failed the physical agility test by 11 seconds. He explained that the Chief of Police had recommended that F. Paquin be retested in 16 weeks.

D. Beal made a motion to follow the recommendation of the Chief of Police to have F. Paquin retested in 16 weeks, and seconded by S. Howitt.

D. Taylor asked how many times F. Paquin would be allowed to take the test?

T. McInerney answered twice, under State Law.

D. Beal explained that under the guidelines of Civil Service an individual could only take the test twice but, the Town was not Civil Service. He went on to say that F. Paquin was working as a full-time officer because he was certified, and that without him, the Department would be short another officer. He said that with the 16 week window, C. Mello would be out of the Academy, and if F. Paquin had not passed the test by then, there would be nothing else that could be done for him.

The roll call vote was:

MS. TAYLOR – yes; MR. BEAL – yes; MR. POLI – yes;
MR. HELGERSON – yes; MR. HOWITT – yes

At 7:35 p.m., a motion was made by N. Helgerson to enter into Open Session, seconded by D. Taylor, and the roll call vote was:

MS. TAYLOR – yes; MR. BEAL – yes; MR. POLI – yes;
MR. HELGERSON – yes; MR. HOWITT – yes

Respectfully submitted,

DANA G. BEAL, CLERK