# EXHIBIT E

COMMONWEALTH OF MASSACHUSETTS

UNITED STATES DISTRICT COURT

Volume I                          Rule 30 Deposition
Pages 1-218


RI SEEKONK HOLDINGS, LLC

vs.

TIMOTHY P. MCINERNEY, ET AL


DEPOSITION OF TIMOTHY P. MCINERNEY, taken in behalf of the plaintiff, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Melissa Prodanis, Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of GOUDREAU & GROSSI COURT REPORTING SERVICE, INC., 63 Winthrop Street, Taunton, Massachusetts, on Wednesday, February 8, 2006, commencing at 9:42 a.m.


* * * * *

1        someone indicate that it would be good or

2        appropriate for the Town to get teeth in dealing

3        with Mr. Tapalian in the future?

4    A    I don't recall that.

5    Q    The executive session -- well --  first of all,

6        you took from the time that you became

7        Administrator until the time of this meeting

8        where Mr. Tapalian is discussed and the

9        reporters are claiming that they heard things in

10        the hallway, in that period of time, did you

11        learn who Mr. Tapalian was?

12            MR. SILVERFINE:  Objection as to form of

13    the question.  You can answer.

14    A    I don't know when I learned of Mr. Tapalian.  I

15        can't say if it was from the 5th to the 25th.  I

16        have no idea if it was after or before that.

17    Q    What do you recall first learning about

18        Mr. Tapalian?

19    A    I think we had every time, just in terms of

20        policy, I guess I'll just go through this

21        quickly, when a board member changes on the

22        Board of Selectmen or they hire a new

23        Administrator, they ask for a litigation status

24        report from town counsel.  Perusing that

| | | |
|---|---|---|
| 1 | | document, again, I can't give details.  I know |
| 2 | | the name was in there. |
| 3 | Q | All right.  Who was town counsel at the time? |
| 4 | A | Um -- |
| 5 | Q | Was it Mr. Lehane? |
| 6 | A | Michael Lehane, correct. |
| 7 | Q | Mr. Lehane would be the one who furnished that |
| 8 | | report? |
| 9 | A | I don't know if it would be him or a secretary |
| 10 | | or someone else's office but it would be him. |
| 11 | Q | Mr. Lehane's office? |
| 12 | A | Yes. |
| 13 | Q | Do you have any understanding as to why the |
| 14 | | attorneys who were actually handling the case |
| 15 | | did not give a report? |
| 16 | A | Handling which case? |
| 17 | Q | Case involving Mr. Tapalian. |
| 18 | A | No.  I don't know why. |
| 19 | Q | Okay.  But your information came from |
| 20 | | Mr. Lehane, his office? |
| 21 | A | Best recollection, yes. |
| 22 | Q | All right.  And what was it that you recall |
| 23 | | learning about, first learning about, |
| 24 | | Mr. Tapalian from that or any other source? |

1   A   I don't recall particulars just that he had been

2       involved in litigation with the Town for

3       sometime, different lawsuits.  Debra Ellison was

4       a lawyer for Kopelman Paige and I don't know if

5       I saw that or someone told me that she worked on

6       a lot of documentation, not documentation per

7       se, but letters that went out with regard to

8       that she was working on the case.  So, that's

9       all I really knew.

10  Q   Did you know Ms. Ellison from prior experience

11      in the Town of Salisbury?

12  A   Yes.

13  Q   Okay.  Did you call her about Mr. Tapalian?

14  A   No.

15  Q   Okay.  What was about the fact that she had

16      worked on something that drew your attention?

17  A   No.  I think one of my employees mentioned her

18      as drafting correspondence to Mr. Tapalian

19      relative to one of the previous lawsuits.

20  Q   Which employee are you referring to?

21  A   Jim Tusino.

22  Q   Okay.  Leading up to this meeting where the

23      journalists claim to have heard things from the

24      hall leading up to that meeting, did you have

```
 1            any discussions with anyone about Mr. Tapalian?
 2    A      I don't recall.  I don't know.
 3    Q      Okay.  At this meeting that we're talking about,
 4            do you remember the meeting?
 5    A      Yeah.
 6    Q      Okay.  And what do you recall being discussed
 7            about Mr. Tapalian at that meeting?
 8    A      I don't recall anything about Mr. Tapalian.  The
 9            only pertinent information I had was Jimmy
10            didn't want to be held responsible for the
11            damages and he wanted to have his job as a
12            special police officer reinstated.  That was
13            what Jimmy always pushed me on, always pushed
14            the Board on; and that's what I took away from
15            that meeting.
16    Q      How would you describe your relationship with
17            Mr. Tusino?
18    A      Today?
19    Q      At that time.
20    A      He was an employee.
21    Q      Okay.  You referred to him as "Jimmy".  Were you
22            on a first name basis with him?
23    A      Jim.  I think Jim was the -- if we were in
24            public session, it was always DPW Director or
```

```
 1              Mr. Tusino but in person it was Jim, yeah.  I

 2              don't think Jimmy was the word but Jim.

 3     Q        And what did Mr. Tusino tell you about

 4              Mr. Tapalian?

 5     A        Well, actually, he didn't tell me about him.  He

 6              told me what he says he was accused of and what

 7              he said he didn't do and lamented about it quite

 8              often only as it relates to his job as a special

 9              police officer because he always wanted to be

10              reinstated as a special cop.  That's what he

11              always thought it was inappropriate for him to

12              be removed based on this allegation and

13              subsequent appeal and allegation and loss and

14              that sort of thing.

15     Q        What, if anything, did you do to investigate

16              personally the matters in litigation that were

17              reported to you by Mr. Lehane's office?

18                   MR. SILVERFINE:  When are we talking?

19                   MR. REILLY:  I'm sorry?

20                   MR. SILVERFINE:  When?

21     Q        Mr. Lehane's office, this initial report that

22              you got, that's what I'm talking about.

23     A        I didn't do anything.  There was nothing for me

24              to do.
```

1   Q   All right.  Did you try to assess in anyway the

2        merits of any of these cases?

3   A   No.

4   Q   All right.  In other words, was there more than

5        just one case on this list as you recall it?

6   A   There were past ones and agreements with the

7        Town regarding a roadway.  I don't know.

8   Q   Let me rephrase that.  Were there reports given

9        to you concerning other persons other than

10       Mr. Tapalian who were involved in litigation

11       with the council or was he the only person on

12       this list?

13   A   No.  I think the Town's been involved with other

14       litigants.

15   Q   All right.  And with reference to that first

16       list that you got, did you make any effort to

17       make an independent determination as to the

18       merits of any of these pending cases that were

19       called to your attention?

20   A   No.

21   Q   Why not?

22   A   No reason.  I can't answer it.  Why would I?

23   Q   Let me ask you this:  Was it of any concern to

24       you whether the Town's position was justified in

1       any of these cases that were in litigation?

2   A   If they're in litigation, there's not a lot that

3       we can do.  We're going to take advice of

4       counsel and the insurance company at the time to

5       take whatever action they recommended to us.

6       There wasn't, you know, Mr. McInerney,

7       Mr. Administrator, what direction should we go?

8       It was far beyond me and my capability to advise

9       the Boards or the communities one way or the

10      other.

11  Q   Did the Town incur litigation expenses as a

12      result of cases involving cases that it was

13      involved in?

14  A   Yeah, unless it was covered by the insurance

15      company.  Insurance company would pay for those

16      pieces.

17  Q   And if it was covered by insurance, there was

18      still a deductible for the Town, was there not?

19  A   Correct.

20  Q   So, all of the litigation had either ongoing

21      expenses or potential expenses for the Town of

22      Seekonk, correct?

23  A   Yeah.

24  Q   Okay.  During your time as Town Administrator,

1       did you ever attempt to determine whether any

2       case that involved the Town in litigation or any

3       officials of the Town to determine the merits of

4       any of these cases, did you ever do that?

5    A  No.

6    Q  Did you ever as Town Administrator attempt to

7       determine whether it was more financially

8       expedient for the Town to settle a claim as

9       opposed to litigating a claim?

10          MR. SILVERFINE:  Objection as to form.

11   A  Again, the insurance company's got to make that

12      determination.  I think they have the first, I

13      think in some of the clauses, they have first

14      right of refusal or first notice to let the Town

15      make the determination if they want to settle

16      the case.

17   Q  There were cases, I think that you said, that

18      don't involve insurance.  I'm including those in

19      my question.

20   A  I don't know.  I don't know.

21   Q  You can't recall any?

22   A  No, not that we weren't covered with insurance

23      for, to settle wouldn't be, at least when I was

24      there, there wasn't an opportunity.  There

```
 1            wasn't an option to do so.  But, again, we would
 2            rely on legal counsel to advise us, cut your
 3            losses, pay it.  If we're wrong, pay it; if you
 4            were right, the cost is going to be so much more
 5            to defend.  We rely on counsel for that input.
 6    Q      All right.  Now, with reference to the executive
 7            session in question, you did not hear any -- you
 8            don't recall anything being said about the Town
 9            -- about it being appropriate for the Town to
10            try to consider future options of any type with
11            Mr. Tapalian?
12                  MR. SILVERFINE:  Objection as to the form.
13    A      No.  I don't recall.  I don't recall.
14    Q      Do you recall the reporters indicating that they
15            could plainly hear the discussion from the
16            hallway?
17    A      Yes.  I remember that they had reported on, you
18            know, what they thought they heard.
19    Q      And wasn't the location of the executive session
20            meetings changed after that news report came
21            out?
22    A      Yes.  Yes.
23    Q      Out of concern for the fact that someone might
24            be able to hear something in the hall?
```

1    A    Yeah.

2    Q    That's correct?

3    A    That's correct.

4    Q    Okay.  And do you recall the reporters

5         indicating that they had heard the remarks about

6         the Town should get teeth for dealing with

7         Mr. Tapalian as he proceeds with development?

8              MR. SILVERFINE:  Can you say that again?

9              (Whereupon the stenographer read back the

10   last question.)

11   A    I don't remember the reporters saying that at

12        all.

13   Q    Do you have any -- assuming -- let me rephrase

14        that.

15             Assuming that the reporters did report that

16        night, I'm not going to mark every possible

17        document at this deposition, but assuming that

18        for a moment, do you have any understanding why

19        the executive session minutes that we have

20        received for that session do not reflect that

21        language?

22             MR. SILVERFINE:  Objection as to the form.

23   A    No.  I have no idea.

24   Q    Who was in charge of preparing executive session

```
 1            minutes at the time?

 2    A       Cindy Dacanay.

 3    Q       And Ms. Dacanay had what position?

 4    A       She was the, I don't know the exact title,

 5            Administrative Secretary to the Board, I want to

 6            say.

 7    Q       And did you during your time as Town

 8            Administrator approach Ms. Dacanay concerning

 9            executive session tapes?

10    A       No.

11    Q       Did you ever ask her to take the tapes of the

12            executive sessions into your own custody?

13    A       Um, tapes, no.

14    Q       Did Ms. Dacanay record the executive sessions

15            using a tape recorder?

16    A       The reason why I pause is because there was,

17            when I got there, there was some controversy

18            about whether it was going to be taped or

19            whether it was going to be handwritten votes as

20            the Board went through just as a general

21            operating procedure.  I think when we started,

22            they weren't taped and then for ease for her to

23            be able to transcribe, they were allowed to be

24            taped.  So, I'm not sure if she taped that
```

1    meeting or not.

2    Q    I'm not confining myself to that meeting.

3    A    No, but she did tape other meetings.

4    Q    During the time that you were Town

5         Administrator, Ms. Dacanay did tape some

6         executive sessions?

7    A    Yes.

8    Q    Okay, number one.  Number two, during the time

9         that you were Town Administrator, she may have

10        missed an executive session here or there

11        because of vacation or other personal reasons?

12   A    Possible.

13   Q    Okay.  And when she was not present, there was

14        no other person taking notes of the meeting,

15        correct?

16   A    The way the Board structure is, you'll have the

17        Chair.  You'll have the Vice Chair and you'll

18        have the secretary and the secretary, you know,

19        whoever's not a member, it turns out to be the

20        secretary.  I don't know who the secretary would

21        have been but they would be responsible under

22        the, you know, the protocol of the Board or the

23        policy of the Board to take, record the meeting

24        minutes.

```
 1   Q   Well, just suggesting to you that Ms. Dacanay
 2       was the secretary during this period of time --
 3   A   She was to the Board but within the Board
 4       itself.
 5   Q   All right.  If she was ill or not there, her
 6       tape recorder, the session would be tape
 7       recorded for her to?
 8   A   I don't think so.
 9   Q   You don't?
10   A   I don't think so.
11   Q   Do you think that someone else came in to take
12       minutes?
13   A   I think that the secretary who was a member of
14       the Board would have kept notes and recorded the
15       votes.
16   Q   Okay.  And who do you recall having -- do you
17       recall any of the selectmen during the time that
18       you were there -- having meetings recorded and
19       then transcribed notes of executive sessions?
20   A   I don't know who was.  No.  I know that
21       Ms. Taylor took copious notes just in every
22       executive session but that's, I don't know, if
23       they were ever transcribed.
24   Q   In any event, Ms. Dacanay did use tape
```

1    A    I do.

2    Q    Okay.  That's kind of similar to your statement

3         about to avoid lawsuits they would be compelled

4         to allow Mr. Tapalian to do whatever he wanted,

5         isn't it?

6    A    I don't think so.

7    Q    Well, in any event, let's go to the last

8         paragraph on the page.  You said you would make

9         the appropriate inquiries into that course of

10        action.  Did I read that correct?

11   A    That's correct.

12   Q    Okay.  And that course of action was to look

13        into whether or not there was a way to suspend

14        the review of further plans for Mr. Tapalian,

15        wasn't it?

16   A    Whether or not it was an appropriate course of

17        action is what I would have determined or I

18        would have asked counsel to determine for us.

19        Is there a way to hold these plans in advance

20        until we do this?

21   Q    You wanted to stop Mr. Tapalian at this point in

22        time, didn't you?

23   A    No.

24   Q    You wanted to find out whether there was any

Q    And that message was received before this letter
     from Mr. Tapalian that we see in Exhibit 12?

A    Yes.

Q    All right.  So, isn't it true that you got
     messages from Mr. Tapalian and you didn't answer
     them because of -- first of all -- why didn't
     you respond to any of the three telephone
     messages?

          MR. SILVERFINE:  Objection as to form.

A    The one I didn't respond to, the voice mail, I
     responded to in writing.  That was my response
     to his voice mail.  And then obviously
     previously discussed what town counsel and the
     Board of Selectmen relative to returning his
     calls, you know, what do we do with people we're
     in litigation with.  And it was fairly clear to
     me that you can do two things, have him into a
     public session and have him make his
     presentation as to what he's looking to do and
     quite honestly I was not comfortable knowing the
     history of lawsuits for the Town having in my
     office closed doors outside conversation with
     Mr. Tapalian just for the simple fact with the
     past litigation that's gone on with the

1    A    I don't know.

2    Q    Were there any other people in town who had

3         litigation pending that you did speak with

4         during your entire time as Town Administrator?

5    A    Not that I recall.

6    Q    Are you aware of the -- were you aware when you

7         were Town Administrator -- of the right of

8         people to petition their government?

9    A    Yeah.

10   Q    To talk to government officials?

11   A    Yeah.

12   Q    Did you have a written opinion from legal

13        counsel concerning the appropriateness of not

14        speaking to someone because of the fact that

15        they had past or present litigation involving

16        the Town?

17   A    I don't know about impending.  All I have those

18        meeting minutes with Mike Lehane that said

19        response was appropriate at least with the

20        Beverly Sweet case.  So, I don't know if we

21        asked for an opinion or not.  I would guess not

22        but I don't know.

23   Q    Is that because you didn't believe that Charlie

24        Tapalian was correct in the lawsuit in Boston?

1       did you exercise during your time?

2  A    In terms of making policy, I was more of, in my

3       role, just as an executive to carry out those

4       administrative policies.  I would promulgate

5       rules and regulations or administrative

6       policies, give them to the Board for

7       administration and ratification.  And once they

8       were executed, we would, you know, go down the

9       path of taking those things on.  If it was

10      inclement weather policy, you had to close town

11      hall and what the parameters are, those are the

12      things we brought to the Board, got their

13      support on, got them executed.  Those are the

14      policies that I would execute on a day-to-day

15      basis.

16  Q    Weren't there daily issues from time to time

17      that you would just deal with that didn't

18      perhaps require a policy?

19  A    Oh, I'm sure, yeah.

20  Q    With reference to the policy that you issued

21      wherein Department Heads were not to speak with

22      anyone involved in litigation with the Town of

23      Seekonk, was that -- that was a policy that you

24      enacted prior to a Board meeting; is that

1    correct?

2  A   I'm not sure if it was before or if it was in

3      consultation.  I think it was in consultation

4      with Mike Lehane's office first and subsequently

5      at a subsequent meeting with the Board, I think

6      he was actually there to confirm that that was

7      probably the right way to go.

8  Q   And in referring to Mr. Lehane's office, was it

9      Mr. Lehane that you dealt with or was it someone

10     else in their firm?

11 A   Mostly Mike.  There was someone else too.  I

12     don't recall her name.  It was a female.  I

13     can't recall her name.

14 Q   And they provided you advice concerning this

15     policy?

16 A   I think so, to the best of my knowledge but I

17     can't be 100 percent sure.

18 Q   All right.  Was this policy that you issued, was

19     this directive that you had issued that we

20     talked about last time, did the Department Heads

21     follow that directive?

22 A   I don't know.  I imagine they did but I do not

23     know.

24 Q   Did any of the Department Heads object about the